IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**97-0191**

~~CIV-RYSKAMP~~

**CIV-MOORE**

----------------------------------------

ALBERT BIAGAS; STEPHEN COLANERO;       )
GINA FLORENS; and ABRAHAM GARFINKEL;   )
                                       )
            Plaintiffs,                )
                                       )
        v.                             )
                                       )   **CLASS ACTION COMPLAINT**
JACK B. CHADSEY; EDWARD L. GRUND;      )
LARRY G. PETERSEN; GEORGE L. PITA; and )
SUNGLASS HUT INTERNATIONAL, INC.,      )
                                       )   **JURY TRIAL DEMANDED**
            Defendants.                )
----------------------------------------

MAGISTRATE JUDGE
BROWN

        Plaintiffs make the following allegations upon informa-
tion and belief, except as to allegations specifically pertaining
to plaintiffs and their counsel, based on the facts alleged below,
predicated upon the investigation undertaken by and under the
supervision of plaintiffs' counsel, and plaintiffs believe that
further substantial evidentiary support will exist for the
allegations set forth below after a reasonable opportunity for
discovery.

### NATURE OF THE ACTION

        1.   This is a class action brought on behalf of
purchasers of securities of Sunglass Hut International Inc.
("Sunglass Hut" or the "Company") against the Company and certain
of its executive officers and directors during the period from
March 21, 1996 through and including October 10, 1996 (the "Class
Period").   During the Class Period, defendants disseminated

numerous announcements concerning the purported financial success and rapidly expanding sales of the Company. Defendants also made numerous positive pronouncements concerning the Company's distribution systems, marketing efforts and product offerings.

2.    Plaintiffs allege herein that these public statements, which drove Sunglass Hut's stock price to a high of $32.50 per share, were materially false and misleading because they failed to disclose, inter alia, a series of major problems and delays in its distribution facilities, rapidly expanding inventories, deteriorating sales, limited product offerings and problems with the Company's marketing efforts.

3.    While these serious problems were concealed from the investing public, the Individual Defendants sold over $5 million worth of their Sunglass Hut stock holdings at or near its highest price during the Class Period. Sunglass Hut also sold $100 million of convertible debentures to private investors during the Class Period.

4.    Ultimately, upon disclosure of the true condition of the Company's business, its failed expansion and poor product offerings, the price of Sunglass Hut stock declined to below $7.00 per share, causing huge losses for Sunglass Hut investors during the Class Period.

## JURISDICTION AND VENUE

5.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-

- 2 -

5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. 240.10b-5].

6.     This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act, as amended [15 U.S.C. § 78aa] and 28 U.S.C. §§ 1331 and 1337.

7.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c). The acts and conduct complained of, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in the Southern District of Florida.  Sunglass Hut maintains, and at all relevant times maintained, its executive offices in this District.

8.     In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ National Market System, a national securities exchange.

**PARTIES**

## Plaintiffs

9.     Plaintiff Albert Biagas, as set forth in the accompanying certification, purchased Sunglass Hut common stock at artificially inflated prices during the Class Period, and has been damaged thereby.

10.    Plaintiff Stephen Colanero, as set forth in the accompanying certification, purchased Sunglass Hut common stock at

artificially inflated prices during the Class Period, and has been damaged thereby.

11.   Plaintiff Abraham Garfinkel, as set forth in the accompanying certification, purchased Sunglass Hut common stock at artificially inflated prices during the Class Period, and has been damaged thereby.

12.   Plaintiff Gina Florens as set forth in the accompanying certification, purchased Sunglass Hut common stock at artificially inflated prices during the Class Period, and has been damaged thereby.

**Defendants**

13.   Defendant Sunglass Hut is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 255 Alhambra Circle, Coral Gables, Florida 33134.   Sunglass Hut is a specialty retailer of prescription and non-prescription sunglasses and operates optical and watch stores.   The Company has a chain of over 1,800 stores throughout the United States, Canada, Europe, Singapore, Australia, the Caribbean and Mexico, offering a purportedly extensive selection of designer, sport and functional sunglasses.

14.   Defendant Jack B. Chadsey is, and at all relevant times was, President, Chief Executive Officer and a Director of the Company.

15.   Defendant Edward L. Grund is, and at all relevant times was, the Company's Senior Vice President -- Store Operations, Real Estate and Construction.

- 4 -

16.   Defendant Larry G. Petersen is, and at all relevant times was, the Company's Chief Financial Officer and Senior Vice President -- Finance.

17.   Defendant George L. Pita is, and at all relevant times was, the Company's Vice President -- Finance and International Development.

18.   As officers, directors, controlling persons and selling shareholders of a company whose common stock is registered with the SEC, traded on the NASDAQ National Market System, and governed by the provisions of the federal securities laws, the Individual Defendants have a duty to disseminate promptly accurate and truthful information with respect to the Company's operations, business, products, markets, management, financial condition, performance and present and future prospects, to correct any previously issued statements that were or have become materially misleading or untrue, and to disclose any trends that could materially affect earnings and the present and future operating results of Sunglass Hut, so that the market price of the Company's publicly traded securities is based upon truthful and accurate information.  The defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.   The Individual Defendants all participated in the drafting, preparation, and/or approval of the various public and shareholder reports and other communications complained of herein and were aware of or recklessly disregarded the material misstatements contained therein and omissions therefrom, and were aware of

- 5 -

their materially misleading nature.  Because of their Board
membership and/or executive and managerial positions with Sunglass
Hut, each of the defendants had access to the adverse non-public
information about Sunglass Hut's business prospects and financial
condition and performance as particularized herein and knew or
recklessly ignored that such adverse information rendered the
positive statements made by and about Sunglass Hut and its business
and performance, materially false and misleading.

        20.  The Individual Defendants, because of their
positions of control and authority as officers and directors of the
Company, were able to and did control the contents of the various
shareholder reports, prospectuses, SEC filings, press releases and
presentations to securities analysts pertaining to the Company.
Each Individual Defendant was provided with copies of Sunglass
Hut's stockholder reports, press releases and SEC filings alleged
herein to be materially false and misleading prior to or shortly
after their issuance and had the ability and opportunity to prevent
their issuance or cause them to be corrected.  As a result, each of
the Individual Defendants is responsible for the accuracy of the
public reports, filings and releases detailed herein and is
therefore primarily liable for the representations and omissions
contained therein.

        21.  By reason of their management positions and/or
membership on Sunglass Hut's Board of Directors, the Individual
Defendants were "controlling persons" within the meaning of § 20(a)
of the Exchange Act and had the power and influence to direct the
management and activities of Sunglass Hut and its employees, and to

cause Sunglass Hut to engage in the unlawful conduct complained of herein.  Because of their executive and managerial positions within Sunglass Hut, the Individual Defendants each had access to adverse non-public information about the business, operations, performance and financial condition of Sunglass Hut and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

22.  Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and on behalf of a class (the "Class") of persons who purchased or otherwise acquired Sunglass Hut securities during the period from March 21, 1996 through and including October 9, 1996 (the "Class Period"), and were damaged thereby.  Excluded from the Class are the defendants herein; members of the immediate family of each of the Individual Defendants; the directors and officers of Sunglass Hut; any corporation, firm, partnership, trust or other person affiliated with any of the foregoing; and the legal representatives, agents, heirs, successors-in-interest or assigns of any excluded person.

23.  The members of the Class are so numerous that joinder of all members is impracticable. As of June 14, 1996, the Company reported that it had 54,176,516 shares of common stock outstanding, and, throughout the Class Period, the common stock of Sunglass Hut was actively traded on the NASDAQ National Market System, an efficient market.  The average daily volume of Sunglass

hut common stock during the Class Period was more than 900,000 shares.   The precise number of Class members is unknown to plaintiffs at this time but Class members are believed to number in the thousands.

24.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

25.   Plaintiffs' claims are typical of the claims of the other members of the Class because plaintiffs and all the Class members' damages arise from and were caused by the same series of materially false and misleading representations and omissions made by or chargeable to defendants.  Plaintiffs do not have interests antagonistic to, or in conflict with, the Class.

26.   A class action is superior to other available methods for the fair and efficient adjudication of this contro-versy.  As the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for most class members individually to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

27.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   Whether defendants participated directly or indirectly in the concerted action or common course of conduct complained of herein;

(c)   Whether the documents, filings, releases and statements disseminated to the investing public omitted and/or misrepresented material facts about the business, performance, and financial condition of Sunglass Hut;

(d)   Whether defendants acted knowingly or recklessly in, directly or indirectly, omitting to state and/or misrepresenting material facts;

(e)   Whether the market price of the Company's securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(f)   The extent of injuries sustained by members of the Class and the appropriate measure of damages.

28.   The names and addresses of the record owners of the shares of Sunglass Hut's common stock purchased during the Class Period are available from the Company and/or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail using techniques and forms of notice similar to those customarily used in class actions arising under the federal securities laws.

## NO SAFE HARBOR

29.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements complained of herein.  The statements pleaded herein were not specifically identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.

## FRAUD-ON-THE-MARKET DOCTRINE

30.  Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Sunglass Hut common stock met the requirements for listing, and was listed, on the NASDAQ National Market System, a highly efficient and automated market;

(b)  As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)  The trading volume of the Company's stock was substantial, reflecting numerous trades each day;

(d)  Sunglass Hut was followed by securities analysts employed by a number of major brokerage firms who wrote reports which were distributed to the sales force and customers of

such firms and which were available to various automated data retrieval services;

(e)   Defendants made public statements which failed to disclose material facts during the Class Period;

(f)   The prices of Sunglass Hut securities responded rapidly to news stories and analyst reports about the Company and information disseminated by the Company and such information was promptly assimilated into the prices of such securities.

(g)   The omissions and misrepresentations were material; and

(h)   The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities.

31.   Based upon the foregoing, plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for the purpose of class certification as well as for ultimate proof of the claims on their merits. Plaintiffs will also rely, in part, upon the presumption of reliance established by material omission and upon the actual reliance of Class members.

**FACTUAL ALLEGATIONS**

**General Background**

32.   According to Sunglass Hut, it is "the world's largest specialty retailer of sunglasses with over 1,850 locations worldwide." The Company is also a specialty retailer of prescription eyewear and operates optical and watch stores. The Company's

stores are located throughout the United States, Canada, Australia, Europe, Singapore, the Caribbean and Mexico.

33. In recent years, in accordance with the Company's purported strategy to diversify its businesses, the Company has vastly expanded its product offerings and geographic locations. As a result of such expansion and diversification, the quality of the Company's financial results purportedly was less susceptible to such factors as the weather and the economic conditions in any particular part of the United States or the world. Thus, for example, the Company's expansion into Australian markets purportedly enhanced its ability to produce consistent financial results, since summer is traditionally the strongest season for the sale of sunglasses and winter in the United States corresponds to summer in Australia. In addition, in the recent past, the Company, which traditionally has opened independent franchise outlets in malls, has pursued a strategy of opening "Sunspots", which are Sunglass Hut boutiques located within larger department stores. The Company also has opened numerous prescription eyewear stores under the "Eye-X" name and its purportedly fast-growing "Watch Station" stores. These developments purportedly insulated the Company from the wide variances in results associated with companies that are highly dependent on single markets or limited product offerings.

34. In conjunction with the Company's apparently rapid expansion, the Company also consolidated its warehouse and distribution facilities, as set forth in detail below. Defendants portrayed this consolidation in highly positive terms, and

represented that the new facility would immediately enhance the
Company's expansion efforts and result in further sales growth.

35.   Thus, at all relevant times, defendants consistently
portrayed the Company as a well-diversified specialty retailer with
a variety of product offerings, rapidly expanding worldwide sales,
and tremendous growth potential facilitated by technologically
advanced inventory management and distribution facilities.

36.   In truth, however, and unbeknownst to the investing
public, the Company was suffering from a variety of serious
problems and setbacks which materially undermined defendants'
glowing representations about its business, strategies and
facilities, which problems can be summarized as follows:

(a)   At all relevant times, the Company's purport-
edly advanced and enhanced distribution system, which had been
consolidated in Atlanta, Georgia, was understaffed, poorly
maintained, and poorly equipped, and the limited staff that the
Company did retain at such facility was inadequately trained.
Moreover, the Company's distribution system was largely a manual
system throughout much of the Class Period, and the Company's
claimed automation of that system was materially delayed, causing
the distribution system to be far less efficient and effective than
represented to the investing public.   The Company also maintained
fewer employees at its single, consolidated facility, than it had
in the past, undermining the ability of the Company to process
orders as quickly as it had been able to in the past.   In addition,
the Company maintained far fewer incoming telephone lines --
apparently only two lines -- for the receipt of incoming orders,

causing significant delays in the placement of orders, and -- on the catalog side of the Company's business -- causing tremendous delays in processing consumer orders, ultimately leading to numerous caller hang-ups on telephone orders, as well as fewer such calls.

(b)   The Company's purportedly highly automated, conveyor belt product picking systems were not operable at least through June 1996.   Instead, the purportedly highly efficient, automated "picking and sending" distribution system was experiencing substantial delays.   All such distribution activities thus continued to be performed manually by the overextended staff, resulting in delivery delays and an exceptional number of improperly and/or erroneously processed orders (an estimated 20% of orders were affected by such errors).

(c)   The serious processing problems described herein were causing significant shipment delays at the Company's distribution facility, causing erratic shipment patterns to stores and the market, and materially impairing the reliability and comparability of the Company's purported inventories at successive periods of time.

(d)   Moreover, throughout the Class Period, the Company's inventory was rapidly expanding.   Rather than being able to "work it off" or return such bloated and growing inventory to the Company's suppliers, as represented by defendants, the Company was not containing the excessive growth in its inventories, materially contradicting defendants' positive representations as to the Company's expected sales, progress in controlling inventories

- 14 -

and purported ability to return excess inventory to suppliers.   For example, the Company was experiencing a rapid build-up of Oakley sunglasses, and the Company could not (and could not reasonably expect to) work off such an oversized inventory position amid declining demand for such products, nor could the Company reasonably expect to dispose of its bloated inventory by returning unsold products to suppliers with whom it enjoyed no such rights of return.

(e)   Indeed, although the Company sought to capture significant sales (and unload its huge overstock) in the 1996 "back-to-school" market, which is traditionally a strong selling period running from approximately the middle of August to the middle of September, the Company was unable to capitalize on this important selling season as a result of the undisclosed problems relating to its catalog marketing efforts.   Such difficulties caused the Company to delay the commencement of a massive and expensive catalog campaign purportedly designed to capture the vital back-to-school market.   As a result of this delay, the Company's back-to-school catalog selling substantially missed the back-to-school market.

37.   Thus, prior to and during the Class Period, Sunglass Hut and the other defendants, in published written statements addressed to the investing public and/or filed with the SEC, portrayed Sunglass Hut and its prospects as rosy and growing rapidly when, in fact, the Company, was suffering problems due to a slowdown in mall traffic, a lack of exciting new products, serious problems in the Company's distribution system and rapidly

- 15 -

increasing inventories. After the close of the Class Period, Sunglass Hut would be forced to take a writedown for bloated inventories and close approximately 100 stores. This deception allowed certain executives and insiders of Sunglass Hut could sell substantially all of their Sunglass Hut holdings for artificially inflated prices and enabled Sunglass Hut to unload $100 million of 5 1/4% convertible debentures to institutional investors. During March and April, 1996 alone, Sunglass Hut insiders sold approximately $9,000,000 worth of Sunglass Hut stock. Defendant Chadsey sold 100,000 shares for proceeds of over $3,200,000. The stock price of Sunglass Hut dropped from over $30 per share to approximately $9 per share at the close of the Class Period. Sunglass Hut's stock currently trades at approximately $7 per share.

**Pre-Class Period Events**

38. During 1995, Sunglass Hut's stock price rose rapidly as investors took interest in the Company's retailing strategy of being a "category-killer" in the high-margin sunglass business (i.e., a dominant market player). However, towards the end of 1995 and continuing until the beginning of 1996, the stock of Sunglass Hut drifted downward as investors sold out of retailing stocks in general and specialty retailers, like Sunglass Hut, in particular. Insiders at Sunglass Hut, who had substantial portions of their net worth tied up in Sunglass Hut stock options, became worried at the drop in the Company's stock price and embarked on a course of conduct designed to artificially inflate the price of Sunglass Hut's stock so that they could sell millions of dollars of stock and so that the Company could sell $100 million in convertible

securities at a conversion price that would not have been possible if the investing public had known the truth about Sunglass Hut's financial condition and prospects.

39. On January 19, 1996, Gerard Klauer Mattison & Co., a brokerage house that has performed banking services for Sunglass Hut, issued a research report on Sunglass Hut and reiterated its "BUY" rating on the stock. Regarding Sunglass Hut's opportunities to improve comparable store sales in 1996, the research report stated that defendant Chadsey "remarked that the [C]ompany's base comp[arable] expectations for the year are roughly 7%, inclusive of a 4% increase in the number of units sold and a 3% increase in price. [Sunglass Hut] possesses several opportunities to exceed its base comp expectations for 1996." (Emphasis added).

40. On January 26, 1996, NBC Professional and Financial Network reported an interview that defendant Chadsey had with Peter Schaknow at the Smith Barney Growth Stock Conference. At this conference, Chadsey was asked how he "live[d] up to the lofty and continually growing expectations of Wall Street?" In response, Chadsey stated:

> I think . . . The way we answer that is we let the numbers speak for themselves. At the end of the day, we recognize that we worship the god of the high PE multiple. At the end of the day, we are expected to produce above that, and I think when you see the results at the end of this year [FY 1996, ended on February 3, 1996], our total sales are up 42 percent on top of 41 percent last year. Our comp[arable] store sales are going to be up 10 percent on top of last year's 79 percent. You just heard me say our store count was up 94 percent.

I think that's a performance way above the norm and that's why, you know, our multiple's been above the norm, and that's consistent. <u>And I think if people who know our analysts well, know that that same kind of performance is projected over the next several years</u>. (Emphasis added).

41. During the same interview, Chadsey, in response to a question about Sunglass Hut's sensitivity to economic swings as compared to other retailers, took the opportunity in his response to downplay the effects of poor weather on the Company's financial performance. He stated, <u>inter alia</u>, as follows:

But, <u>because we're now in global markets, we're not as affected by economic swings in a given market, or weather patterns</u>, for that matter. (Emphasis added).

42. On February 27, 1996, Sunglass Hut reported that it had signed a letter of intent with Royal Sporting House Pte Ltd. of Singapore to enter into a joint venture for the purpose of opening Sunglass Hut stores throughout Southeast Asia. In the same press release, defendant Chadsey stated:

"<u>We are extremely excited about this opportunity to form a joint venture entity with Royal Sporting House because the Southeast Asian market has tremendous growth potential.</u> The extensive retail expertise and local infrastructure of Royal Sporting House will complement    Sunglass Hut's own marketing concepts and facilitate our entry into this new market." (Emphasis added).

43. On March 7, 1996, Sunglass Hut reported that sales for the four-week period ended March 2, 1996 were $32.9 million, an increase of 42.6% above the $23 million reported for the same period the prior year. Comparable store sales, a key indicator of growth for a company like Sunglass Hut that is opening hundreds of new stores each year, rose 11.1% during the same four-week period.

Commenting on these results, defendant Chadsey stated: "This strong comparable sales performance, coupled with our focus on new business strategies, promises to make 1996 an exciting year for Sunglass Hut." (Emphasis added.)

## Class Period Events

44. (a) The positive representations described above were reflected in the price of Sunglass Hut securities at the beginning of the Class Period herein. The Class Period commences on March 21, 1996, the date on which Sunglass Hut announced its financial results for fiscal year 1995, ended February 3, 1996. Among other things, the Company reported that for the fiscal year ended February 3, 1996, earnings exclusive of acquisition expenses were $0.52 per share, an increase of 53% compared to earnings of $0.34 per share for the same period the prior year. Earnings inclusive of acquisition expenses were $0.38 per share or $20.9 million. Sales for the 53 weeks ended February 3, 1996 increased 44.2% to $418.2 million, as compared to sales of $290.0 million for the 52-week period ended January 28, 1995. Comparable store sales for the 52-week period ended January 28, 1996 increased 10.3% from the 52-week period the prior year.

(b) Commenting on these results, and in an effort to differentiate the Company from other specialty retailers, defendant Chadsey stated:

> We are extremely pleased to report that fiscal 1995
> earnings increased 53%, especially in a year when
> most retailers were experiencing a difficult retail
> climate. Sunglass Hut is undoubtedly the store of
> choice for savvy sunglass consumers throughout the
> world. And continuing along the lines of good

news, I am pleased to announce the launch of Watch Station, which we believe has substantial growth potential. Further, when we combine our Watch Station strategy with the expansion opportunities of our new EyeX premium optical stores, <u>the long-term growth prospects for Sunglass Hut increase dramatically</u>. (Emphasis added.)

(c) Based on the Company's closing stock price on March 21, 1996 ($30.50 per share), and using the foregoing quarterly earnings data on an annualized basis, Sunglass Hut's price to earnings ratio (P/E) was approximately 58.65. This P/E multiple reflected the market's premium valuation for this specialty retailer's stock. The market ascribed this high P/E to Sunglass Hut stock based on defendants' then-present statements concerning the Company's growth through 1996 and 1997.

45. In addition to the various problems described above which were materially impairing Sunglass Hut's performance, the foregoing statements concerning continued growth were materially false and misleading because the Company's long-term growth prospects were not dramatically increasing as defendants represented. In fact, the various problems afflicting the Company at that time materially impaired its ability to achieve continued growth.

46. At or about the same time, the April 1996 issue of <u>Catalog Age</u>, a trade publication in the specialty retail industry, included an article about Sunglass Hut's consolidation of its distribution operations. The article emphasized the purported cost savings and efficiencies of the consolidation, and quoted Sara Wilkins, a Company spokesperson, as highlighting that:

> The new center enhances the efficiency of our
> organization. Having all our operations under one
> roof makes tracking catalog orders and shipments
> that much easier.

47.  The foregoing statements concerning the Company's

new distribution center misleadingly implied that the Company's

distribution center already had been opened and was operating at or

near full capacity, when in fact it had only opened for developmen-

tal purposes.  Accordingly, Defendants materially overstated the

impact the new facility was having and could in the near future

have on the Company's financial performance.

48.  On or about April 11, 1996, the Company reported a

7.4% increase in same store sales in March 1996 over March 1995,

and an increase in overall sales for the five week period ended

April 6, 1996 of 34.6% over the comparable period in the prior

year.  Commenting on these sales results, defendant Chadsey stated:

> Despite less than favorable weather conditions and
> slower than normal mall traffic during the first
> three weeks of the month, we experienced a rapid
> acceleration of sales during the Easter week which
> generated positive momentum going into the April
> time period.  (Emphasis added.)

49.  The foregoing remarks were intended to convey the

impression that sales trends were strong.  Defendant Chadsey's

statements regarding accelerating sales and positive momentum were

materially false and misleading because they failed to disclose the

adverse facts described above, and because the Company did not have

"positive momentum" and accelerating sales as represented.  Indeed,

the Company could not have such momentum given the material

difficulties the Company was experiencing with its dramatically

rising inventories and developmentally-delayed new distribution facility.

50. (a) As detailed more fully below, one of the principal reasons Sunglass Hut was touting its prospects during March and April was to maintain the artificially high stock price to allow six insiders to sell almost 300,000 shares at prices between $28 and $32.70 per share. Specifically, the Company's Senior Vice President and Chief Financial Officer, defendant Petersen, exercised options for, and sold, 34,500 shares. This sale constituted all of Petersen's exercisable options. The Company's Vice President of Finance and International Development, defendant Pita, exercised options for, and sold, 22,500 shares. This sale left Pita with only 5,000 exercisable options. The Company's Senior Vice President, defendant Grund, exercised options for, and sold, 36,250 shares, leaving Grund with only 16,000 exercisable options. Vice President Michael Mooar ("Mooar") exercised for, and sold, 57,000 shares. This sale cleared out Mooar's entire position of exercisable options and left him with only 4,000 shares. In addition, Vice President of Human Resources, Lesley Berkovitz ("Berkovitz") sold 10,000 shares of Sunglass Hut stock.

(b) According to the June 10, 1996 <u>Fort Lauderdale Sun-Sentinel</u>, "the four [Petersen, Pita, Grund and Mooar] hold little to no [Sunglass Hut] common shares, choosing to keep most of their holdings in the form of options." The exercise of stock options, followed by the immediate sales of the acquired shares reflected senior management's desire to make quick profits on the

- 22 -

inflated price of the Company's common stock, rather than make a long-term investment in the Company's future growth.

51.   (a)   On April 24, 1996, Sunglass Hut stated at a Montgomery Securities Growth Stock Conference that it expected earnings to grow to $0.75 per share in fiscal 1996 (ending February 3, 1997), mainly through new store openings. According to defendant Chadsey, the growth in sales and earnings will come from "the aggressive expansion program we have underway." At the end of 1995, Sunglass Hut had approximately 1800 stores. Sunglass Hut stated that it expected to open 350 new stores in 1996, 200 of them in the United States and the rest in Southeast Asia, Australia and Europe.

(b)   Thus, in an interview reported over the Bloomberg Business News network, defendant Chadsey reiterated the continuing growth trajectory of the Company. The dialog between defendant Chadsey and Vidya Root of Bloomberg Business News included:

> Root:       You were here at the Montgomery Securities
>             conference and you presented the outlook for
>             your company going forward into fiscal 96
>             which ends, I guess January 31st. One of the
>             analysts here said that you can expect growth
>             of about 75% for 1996 are you comfortable with
>             that kind of growth rate?
>
> Chadsey:   Yes, we are comfortable with the growth rate.
>             Basically with the new business strategies
>             that we've developed plus the continued in-
>             creases we expect on our comparable source
>             base, we're very comfortable with the ana-
>             lyst's estimate on the street today.
>
> Root:       Where is the growth gonna come from? You have
>             about 1800 stores right now.   Where do you
>             suppose the growth's gonna come from?

Chadsey:    Well, on the comparable source side, which is
            our existing store base, we continue to see
            growth with some of the emphasis we've had on
            the sport and fashion categories in sun-
            glasses.  We have our, we've increased our
            direct mail pieces which is a major driver of
            comparable store business, be up 55% this
            year.  We expect that to continue to drive
            business.   One of the acquisitions we made
            last year which is 350 stores of Sunsations,
            we have enhanced those stores through new
            merchandise assortments, management changes,
            refixturization, we would expect those stores
            to increase.  And we've added the Suncriptions
            program which will be in probably 300 stores
            by the end of the year.   All those factors
            will continue to drive comp business.   On the
            new store side we're gonna add 350 locations
            this year.   Roughly 200 of them will be in
            still domestic markets, 150 of them in inter-
            national markets between Europe, Australia and
            Southeast Asia with maybe an entre into Latin
            America.   And we've also, in the genesis of
            opening two new business strategies, one of
            them which is IX, which is an optical store
            kind of positioned like the Banana Republic of
            optical stores and the new watch strategy,
            First Door, which will open in May of this
            year.

Root:       For the first two months of this fiscal year,
            you're comparable store sales have been about
            8% or 8.9%, that's lower than the 10% you had
            in fiscal 95.   Do you suppose that's gonna
            change in the months to come and were those
            particularly slow months?

Chadsey:    Most of the analysts' estimates for 1996 have
            a 7-8% comp built into the base.   Clearly, our
            expectations are to exceed those numbers,
            however, as a company does mature, your comps,
            even last year we had a budget of 7-8% and we
            hit 10% because of some favorable market
            conditions, so we would not be at all unhappy
            nor, I think, would the street be unhappy with
            a 7-8% comp for 1996 on top of the additional
            growth that we have planned.

                          *    *    *

Root:       Does the retail sector particularly in the
            U.S., didn't have a very good year in 1995,

but you had an EPS growth of 53%. How do you account for that and what do you see your outlook for 96 and say, 97 on the EPS end?

Chadsey:   Well, clearly, we recognize we traded at a high PE multiple and if you're gonna trade at a high PE multiple, at the end of the day, you have to deliver performance over and above. We continue to be able to see store growth continued in the 30 plus percent range and EPS growth to exceed that number significantly over the next few years again, because of the new business strategy, our continued growth in international markets and our building of our, our comp store base business.

Root:      The $1 a share that Montgomery is looking for in 97, is that something you're comfortable with?

Chadsey:   Yes. We're very comfortable with those numbers and I think, again, if some of these new business strategies really start to take off, we also see potential for obviously exceeding that in the future.

(c)   These statements regarding future growth and expansion had no basis in fact. By the end of the Class Period, Sunglass Hut would be forced to disclose that its growth strategy had been masking serious underlying problems with the Company and, as a result, the Company would implement numerous corrective actions including closing approximately 100 stores.

52.   Just after the price of Sunglass Hut's stock had risen in response to his bullish statements, defendant Chadsey sold 100,000 shares from April 25, 1996 to April 30, 1996 at artificially inflated prices ranging from $32 to $32.70 per share, netting him over $3,200,000.

53.   (a)   On or about May 3, 1996, the Company filed a copy of its Annual Report for fiscal year 1995 with the SEC. At or about that same time, the Company disseminated its Annual Report to

- 25 -

shareholders and other members of the investment community.   The
1995 Annual Report included a letter to shareholders over the
signatures of defendant Chadsey as well as James N. Hauslein, the
Chairman of the Company's Board of Directors.   This letter, which
spoke glowingly of the Company's past and future, stated, in
pertinent part, that:

> Our financial performance in fiscal 1995 was
> impressive, setting records for both sales and
> earnings ...
>
> Our direct mail catalog program also regis-
> tered tremendous growth ... which we estimate
> contributed  roughly 2-3% in comparable store
> sales growth for the year.
>
> As we move forward into 1996, we expect to see
> sustained growth in all areas of the business.
> ...
>
> We anticipate that in 1996 we will mail 14
> million catalogs, further driving comparable
> store sales.   (Emphasis added.)

(b)   In addition, the text of the Annual Report
characterized the Company as experiencing dynamic growth in a
continuing setting of expanding worldwide acceptance of its
products.   Thus, the Annual Report declared at page 6:

> The domestic sunglass market continues to
> trend upward ...
>
> With more than 1,700 locations worldwide,
> Sunglass Hut is clearly the category killer.
> Sunglass Hut expects to remain the dominant
> force in the premium sunglass market as
> heightened health concerns, more specialized
> uses for sunglasses, evolving fashion trends,
> and constant product replacement increase the
> demand for our product.   (Emphasis added.)

(c)   In addition, the Company's Annual Report
represented that its purportedly state of the art distribution

system provided a further basis for continuing growth, stating at page 10:

> Our sophisticated point-of-sale computer system enables us to pinpoint sales trends both by location and by merchandise category. This allows us to keep ahead of the competition by identifying what's hot, ensuring that stores have adequate stock on hand and working with vendors to develop new products.

(d)   The Company also hyped its "Key Vendor Partnerships" in the Annual Report (at page 8), suggesting that these relationships gave the Company specialized expertise and improved distribution, declaring:

> Our dominant position in the premium sunglass industry affords unique opportunities with our key vendors to offer the best prices, launch new products, arrange for exclusive product lines, and ensure distribution efficiencies.

54.   On May 5, 1996, Sunglass Hut filed with the SEC its Annual Report on Form 10-K for the fiscal year ending February 3, 1996 and again reported the same financial information the Company had set forth in its March 21, 1996 announcement.

55.   On May 9, 1996, Sunglass Hut announced that sales for the four weeks ended May 4, 1996 were $40.4 million, an increase of 31.7% above the $30.6 million reported for the same period last year and that comparable store sales for the four-week period increased 5%.  Sales in the first quarter increased 35.6% to $122.8 million, compared to $90.5 million for the first quarter of 1995 and comparable store sales increased 7.6% for the three-month period.  Defendant Chadsey once again downplayed the effects of

poor weather and slow mall traffic on Sunglass Hut's results.   He stated:

> <u>Despite difficult weather conditions, as well as slower than normal mall traffic from mid-March to mid-April</u>, we are encouraged that the business trend for the last two weeks of April was back to the same levels we achieved during February.   <u>This recent performance gives us strong momentum moving into the second quarter.</u>   (Emphasis added.)

56.   On May 22, 1996, Sunglass Hut announced with great fanfare, the opening of its 2000th store.   The store was located next to Macy's at Herald Square in New York City.   According to Chadsey, "the opening of our Herald Square store is very exciting for a number of reasons.   We believe that because of its high-profile, highly trafficked location, it will serve as a flagship store for Sunglass Hut.   In addition, this is our 2000th store -- which is an important milestone in the tremendous growth of our company.   Just last year at this time we were celebrating our 1000th store opening."   What Chadsey failed to disclose was that the Company's problems were being masked by the feverish opening of new stores and that only six months later, Chadsey would have to retrench and close approximately 100 stores due to lackluster sales.

57.   (a)   On or about May 23, 1996, the Company purported to announce financial results for the first quarter of fiscal 1996, ended May 4, 1996.   For the three months ended May 4, 1996, the Company reported that earnings per share increased 44.4% to $0.13 per share or $7.2 million, compared to $0.09 per share of $5.0 million for the first quarter of the prior year.   For the three

months ended May 4, 1996, the Company reported that sales increased 40.2% to $122.8 million, compared to $87.6 million reported for the first quarter of 1995.  For the three months ended May 4, 1996, the Company reported that comparable store sales increased 7.6%.

(b)   Commenting on these results, defendant Chadsey stated:

> Despite less than favorable weather conditions throughout most of the first quarter, we enjoyed strong sales in regions not impacted by weather. This gives us confidence that as sunny, summer weather begins to break across the country, <u>our sales will return to the levels which we have enjoyed in the past</u>.  (Emphasis added.)

(c)   Based on the Company's closing stock price on May 23, 1996 ($27.125 per share), and using the foregoing quarterly earnings on an annualized basis, Sunglass Hut's P/E ratio was approximately 52.15, reflecting the market's premium valuation. The market ascribed this high P/E ratio to Sunglass Hut stock based on defendants' then-present statements concerning the Company's continued growth through 1996 and 1997.

58.   On May 31, 1996, Alex. Brown & Sons, Inc., a Baltimore, Maryland based brokerage house, issued a "Strong Buy" on Sunglass Hut's stock.   The brokerage house quoted Sunglass Hut insiders as stating that the Company's fashion-oriented products were selling well.  According to Alex. Brown's report:

> "Sunglass Hut indicated that <u>product trends remain intact, with sales of sport and fashion sunglasses leading the way</u>.  The Company did note that traditional sunglass from Ray-Ban were also showing some signs of improvement as well.  Sunglass Hut's management just returned from MIDO -- the largest eyewear show in the word -- where it found that plastic frames are in style and will likely be stronger than metal frames.  In addition, the "Jackie O" look is back in style, with

larger plastic frames fairing well.  <u>The Company also noted that sales of key designer products, i.e., Calvin Klein, are performing well</u>.  (Emphasis added.)

59.  On or about June 1, 1996, CNN, the Cable News Network, reported that the sunglass market "is hotter than ever" based in substantial part on information from and statements made by representatives of Sunglass Hut.  CNN quoted Sunglass Hut's Manhattan Manager, who emphasized, among other things, that:

> There's absolutely no price resistance at all, especially here in New York.  All they're inter- ested in is do I look hot, do I look fashionable, does this accessory go with what I'm wearing.  So price isn't a factor.

The report also stated that "Sunglass Hut says many people are repeat investors" in expensive sunglasses, implying exceptional growth prospects for the Company's markets.  These remarks were repeated in subsequent CNN programs, including the June 29, 1996 "Managing With Lou Dobbs" program.

60.  On or about June 6, 1996, the Company reported its store sales results for the four week period ended June 1, 1996. The Company reported sales in that period of $48.7 million, an increase of 29.2% over the $37.7 million reported for the same period in the prior year.  The Company also reported that compara- ble store sales increased 7.4%.  Commenting on these results, defendant Chadsey stated:

> <u>We continue to experience strong sales</u> in both the fashion and sport segments of our business.  We believe <u>our excellent in-stock position</u> on both basics and trending sunglasses, coupled with our four million catalog mailings during May and June, <u>position us to maximize sales during the important June and July sales period</u>.  (Emphasis added.)

61.  (a)  Also on or about June 6, 1996, the securities firm of Robertson Stephens & Co. issued a report on the Company, based on Company guidance.  Among other things, the report highlighted the Company's May same store sales results and emphasized a resumed growth trajectory in subsequent quarters, rating the Company "Long Term Attractive" (a positive rating) and stating, in pertinent part, that:

> Business trends throughout the month were fairly stable ...  Also of note, <u>the company's new distribution center in Atlanta is up and running, servicing all stores</u>.
>
> 2Q expectations:
> Accelerated Same-Store Sales Growth Anticipated for 2Q.  While the comps came in 7.0%, we believe there are strong signs to suggest comps momentum will accelerate in the second quarter and beyond:
>
> (1)  In the 1Q, the company did not really benefit from significant incremental gains in catalog mailings.  While Sunglass Hut expects to mail 14 million catalogs in 1996 versus 9 million last year.
>
> (2)  In 1Q, Sunglass Hut did not benefit materially from the roll-out of the Sunscriptions program (i.e. the selling of prescription sunglasses within existing stores).  Sunglass Hut has recently completed rolling out the training for Sunscriptions to 200 of its stores.  If Sunglass Hut sells one pair of prescription sunglasses every other day in each participating store, we believe this could add 1%-2% in comps for the remainder of the year.
>
> As a result, we continue to project an 8.5% comp-store sales increase for 2Q and an 8.2% same-store sales increase for the entire year.

(b)  This report, like the other reports of securities analysts issued during the Class Period, was based on Company guidance and information uniquely within the control of the

- 31 -

Company.  By such reports caused by defendants, the market was additionally misled by defendants' deceptive conduct.

62.  On or about June 20, 1996, the Company sold in a private offering approximately $100 million of convertible debentures to institutional investors.  The Company stated that the proceeds were to be used for refinancing outstanding indebtedness and to finance the Company's expansion plans.

63.  On or about June 27, 1996, the securities firm of Alex. Brown issued a report, based on Company guidance, highlighting Sunglass Hut as a "Strong Buy" because, among other things:

> 30-35% growth projected.  We believe that RAYS will enjoy strong sales and earnings growth driven by both its new and existing concepts. RAYS is one of the fastest growing retailers in our coverage.

> "Strong buy" rated.  Our price target is $35, which is based on 35x our 1997 EPS estimate of $1.00.

64.  (a)  Similarly, on or about July 1, 1996, the firm of William Blair & Co. issued a report, based on Company guidance, which declared that "[w]e spent some time with management after their conference presentation last week" and concluded based on these conversations with the Company that "Sunglass Hut continues to have strong growth prospects both through its core business and two new concepts ...  We remain comfortable with our long-term earnings growth rate of 25%-30% and note that our 1996 and 1997 earnings estimates represent 46% and 36% increases, respectively." (Emphasis added.) Although the report mentioned that Sunglass Hut's new distribution center had "some temporary glitches that resulted in missed shipments and product shortages", the report, which was

expressly based on communications with Sunglass Hut officials, also noted that:

> <u>Management believes</u> that the issue of limited product supply from key vendors should be resolved by August, and the distribution center should be running smoothly.  So this likely will help to support third-quarter sales ... .

The report also noted that the Company reported shortages of supply from "key vendors" which affected sales and that the report's sales estimates were "more conservative than <u>management's guidance</u>". (Emphasis added.)  Moreover, the report pointed out that Sunglass Hut was "working more closely with vendors [such as Oakley] to understand their production capacity and constraints and to share forecasting assumptions ...."

(b)  This report, like several other reports making reference to problems at the Company's distribution center, were materially false and misleading because they failed to disclose adequately the nature and magnitude of the problems that the Company was experiencing at the distribution center and because they misled investors to believe that the Company's problems at the distribution facility were minor and transitory and had been fully resolved.

65.  Likewise, on or about July 5, 1996, William Blair & Co. issued a report on Sunglass Hut, based on Company guidance, recommending that investors "buy" the stock at a then-recent price of $17.50 per share, emphasizing the Company's purported strong catalog selling efforts and concluding that:

> In our view, the catalyst that would drive this stock higher is a strengthening in core

business sales trends.  Could it take a month or two or three?  That is the uncertainty.  But we do believe that there are several factors that should help in the back half of the year.

1)  Sunscriptions will be in more stores (about 300), and employees will have become more comfortable with the program.

2)  The company will have higher quantities of Oakley square jackets, as well as new product introductions by Oakley ... late in the third. . . .

3)  This is the first year the company will be testing new product (for spring rollout) during Christmas, and management expects some exciting fashion styles at that time.

4)  There should be a higher number of catalog mailings, with an extra Oakley catalog in August and 3 million more catalogs in the fourth quarter versus last year.

66.  Analyst reports concerning Oakley similarly carried the message from Sunglass Hut management that sunglass sales were strong.  For example, reports issued by Merrill Lynch on July 2, 1996 and July 9, 1996, reported that:

Indications are that growth of the sunglass market remains strong despite recent concern about Sunglass Hut's weaker comp store sales growth in June.  OO's [Oakley's] products continue to sell well at Sunglass Hut and are gaining market share.  Sunglass Hut management indicated they cannot get enough of the new OO product.  (Emphasis added.)

67.  According to the July 8, 1996 issue of Barron's, "several convertible investors [i.e. purchasers of Sunglass Hut debentures] said company officials, when asked about June sales immediately prior to the convert offering, gave no inkling of any problems."

68. On or about July 11, 1996, the Company reported sales results for the five weeks ended July 6, 1996. The Company reported that sales for the five weeks ended July 6, 1996 were $68.6 million, an increase of 29.3% above the $53.0 million reported for the same period last year. Year-to-date sales for the 22 weeks ended July 6, 1996 reportedly increased 32.4% to $240.0 million. This compares to sales of $181.2 million for the same period in 1995. Year-to-date comparable store sales increased 6.8%. Commenting on these results, defendant Chadsey stated in language suggesting that the Company could achieve good comparable results:

> Despite slow mall traffic and sluggish overall retail sales activity, we were able to generate a 5.3% comparable store increase at full profit margins. Of particular note, we were pleased with the performance of both the Sunsations and Sunscriptions stores, as they significantly outperformed the Sunglass Hut average. We continue to be pleased with the performance of both EyeX and Watch Station and remain on schedule to open 50 and 75 stores respectively by year end.

69. On or about August 16, 1996, the Company reported sales results for the four weeks ended August 3, 1996. The Company reported that sales for the four weeks ended August 3, 1996 were $49.3 million, an increase of 27.3% above the $38.7 million reported for the same period the prior year. Sales in the second quarter reportedly increased 28.7% to $166.5 million, compared to $129.4 million for the second quarter of 1995. Comparable store sales reportedly increased 4.9% for the three month period. Year-to-date sales for the 26 weeks ended August 3, 1996 reportedly increased 31.5% to $289.3 million. This compares to sales of

$219.9 million reported for the same period in 1995. Year-to-date comparable store sales reportedly increased 6.0%. Commenting on these results, defendant Chadsey stated:

> Despite slower than expected mall traffic coupled with strong comparable store sales comparisons of 15.15 in July of 1995, we delivered positive comps at full merchandise margins.
>
> In light of slower mall traffic and the August 1995 comparable store sales comparison of 18.8%, we would expect August comparable sales to continue at the same general trend as experienced in July.
>
> We would expect this sales trend to improve later in the third and fourth quarters for the following reasons: an anticipated increase in mall traffic as the holiday season nears; lower comparable store sales comparisons from 1995; the introduction and the increased flow of new products from key suppliers; and the expansion and refinement of our catalog and Sunscriptions programs. (Emphasis added.)

70. On or about August 22, 1996, the Company reported financial results for the second quarter and first six months of fiscal 1996, ended August 3, 1996. For the three months ended August 3, 1996, earnings per share reportedly increased 24% to $0.36 per share or $20.0 million, compared to reported earnings per share (exclusive of $10.1 million of non-recurring expenses related to acquisitions) of $0.29 per share or $15.9 million for the second quarter of the prior year. Inclusive of these expenses, net income was reported to be $8.4 million, or $0.15 per share, for the second quarter of the prior year. For the three months ended August 3, 1996, sales reportedly increased 30.6% to $166.5 million, compared to the $127.5 million reported for the second quarter of fiscal year 1995. For the three months ended August 3, 1996, comparable store sales increased 4.9%. For the six months ended August 3,

- 36 -

1996, earnings per share reportedly increased 29% to $0.49 per share, or $27.2 million, compared to reported earnings per share of $0.38 per share or $420.9 million for the similar period the prior year (exclusive of acquisition costs). Inclusive of these expenses, net income was reported to be $13.4 million or $0.25 per share for the first half of the prior year. For the six months ended August 3, 1996, total sales reportedly increased 34.5% to $289.3 million over comparable store sales results for the same period in the prior year. Commenting on these results, defendant Chadsey, adding to the drumbeat of claims about new products and enhanced sales, stated:

> Despite slower than expected mall traffic, coupled with strong comparable store sales of 10.9% for the second quarter of 1995, we delivered second quarter comps of 4.9% at full merchandise margins which results in a 24% improvement in EPS over 1995. "We are excited by the increased flow of new products from key suppliers; and the expansion and refinement of our catalog and Sunscriptions programs, as well as the growth of new business strategies."

(Emphasis added.)

71.   (a)   In addition to being materially false and misleading for the reasons stated above, these remarks were also materially false and misleading because there was no increased flow of new products. Indeed, by this time, the Company had been informed by Oakley, one of its largest suppliers, that Oakley's next generation sunglasses, which were under development, were experiencing significant developmental delays which would materially delay their introduction into the market.

(b)   Based on the Company's closing stock price on August 22, 1996 ($16.00 per share), and using the foregoing

quarterly earnings data on an annualized basis, Sunglass Hut's P/E ratio had declined to approximately 22.22, reflecting a relatively high premium valuation for this specialty retailer's stock. The market ascribed this high P/E to Sunglass Hut stock based on defendants' then-present statements concerning the Company's growth through 1996 and 1997.

72. Following the Company's earnings announcement, several securities analysts issued positive reports about Sunglass Hut based on Company guidance:

(a) On or about August 22, 1996, William Blair & Co. issued a report emphasizing the Company's near-term growth prospects, in part based on catalog selling efforts, stating in pertinent part, expressly based on guidance from management of Sunglass Hut, that:

> The company ended the quarter with $150 million in inventory, up 68% from last year and up 25% store-for-store. Recall that inventory levels were also high at the end of the first quarter, and management had hoped to work through them during the second quarter. However, with lower-than-planned sales as well as management's decision not to distract the distribution center or sales associates with returns during these important months, the company did not reduce inventory levels as it had hoped. We fully expect inventory levels to decline over the balance of the year and expect that by year end the increase in per-store inventory should be in line with projected same store sales gains. <u>Given that there is little obsolescence risk with sunglasses and most can be returned or exchanged, there is little markdown risk. Additionally, management is working with vendors to extend payment terms on some of the more traditional product, which it might not return. Consequently, we are not too concerned.</u>
>
> Outlook

This has been a difficult quarter for Sunglass Hut ... lack of exciting new product, particularly Oakley, which was in high demand, but not enough quantity; slow mall traffic, particularly in June and July; cold rainy weather in certain regions of the country (May); distribution center glitches (June), which slowed shipment of products to the stores; and less-than-planned benefit from catalog mailings. ...

Looking forward, we believe that our comp assumptions are realistic and we reaffirm our EPS estimates of $0.06 and $0.13 (including $0.01 for new business) for the third and fourth quarters, respectively, and $0.95 for fiscal 1997 (including $0.05 for new businesses). ... The company will mail 750,000 Oakley catalogs this week, and with strong in-stock position of Oakley (and especially the new straight jacket and square e-wires), this could help to drive sales in the last week of this month and during September. Management noted that upcoming catalogs would focus only on product with sufficient quantities in stock and at most stores in the chain (note that these were two lessons that the company learned with the spring mailings). (Emphasis added.)

(b)   Alex. Brown issued a report on or about August 23, 1996, summarizing a Company conference call with analysts and investors, in which Defendants downplayed and otherwise offered excuses for the Company's recent increase in inventories, and which only barely hinted at continuing problems at the distribution center, as follows:

HIGHLIGHTS OF THE CONFERENCE CALL
INVENTORY ABOVE PLAN, NO UNUSUAL MARKDOWNS EXPECTED.  Sunglass hut's inventory levels increased 77% in F2Q to $150 million. Management indicated that $5 million of the additional inventory was related to new concepts. Excluding inventory related to the new concepts, inventory per sunglass store increased approximately 37%. Management indicated that inventory levels were above plan in the quarter for several reasons:

THE COMPANY DID NOT PROCESS ALL OF ITS NORMAL
SEASONAL RETURNS.  Sunglass Hut typically
returns slow moving merchandise in July;
however, this year returns will be handled in
September.  The delay was the result of ear-
lier issues at the distribution center coupled
with management's desire that store personnel
focus on selling product rather than on pro-
cessing returns.  We believe that Sunglass Hut
will return inventory in excess of $5 million
to its vendors this quarter.


EXCESS INVENTORY FROM THE WAREHOUSE CONSOLIDA-
TION.  . . .

SLOWER SALES.  Sunglass Hut's sales were below
our original estimate in F2Q.  The Company
generally carries higher than normal inventory
levels during the seasonally strong selling
period in an effort to maintain its in stock
position.  However, sales were somewhat slug-
gish leading the Company to an over-invento-
ried position.

STRONG FLOW OF NEW OAKLEY MERCHANDISE.  This
is a positive for Sunglass Hut.  The Company's
in stock position has improved significantly
over the last month.  The Company has worked
closely with its leading supplier to increase
its inventory position in anticipation of a
planned mailing of Oakley catalogs that will
be in-home next week.

THE COMPANY PLANS TO REDUCE INVENTORY LEVELS
BY RETURNING EXCESS PRODUCT TO VENDORS AND BY
REDUCING FUTURE ORDERS ON MARGINAL GOODS.  We
also believe that the growth in the store base
will help ease inventory pressures.  Manage-
ment anticipates that inventory will be closer
to plan by the end of the year if results
remain on track....

73.  On or about September 4, 1996, the Company reported

sales results for the four weeks ended August 31, 1996.  The

Company reported that sales in that period were $44.1 million, a

reported increase of 31.2% above the $33.7 million reported for the

same period the previous year.  Comparable store sales for the four-week period reportedly increased 2.5%.  Year-to-date sales for the 30 weeks ended August 31, 1996 reportedly increased 31.5% to $333.4 million.  This compares to reported sales of $253.6 million for the same period in 1995.  Year-to-date comparable store sales reportedly increased 5.5%.  Commenting on these results, defendant Chadsey stated:

> In the face of continued slow mall traffic and 18.8% comparable store sales during August of 1995, we generated 2.5% comps at full merchandise margins.  We are pleased by the improved flow of new merchandise from our suppliers and look forward to lower comparable store sales comparisons in the coming months.

74.  This announcement was followed by several analyst reports highlighting the seeming success of the Company in "working off" excess inventories and returning to its purported growth trajectory.

(a)  Thus, a Bear Stearns report issued on or about September 4, 1996 stated pertinently:

> August is RAYS most difficult comparison of the year.  A mailing of 750K Oakley catalogs last week is intended to generate both higher volumes of traffic and sales.  RAYS does have enough Oakley inventory in order to be able to meet demand.  RAYS inventory levels were higher at the end of Q2, and are in the process of being reduced over the next two quarters.

(b)  A report that same date from Alex. Brown stated that:

> Same store sales expected to improve in September.  The Company noted that it expects same-store sales to improve beginning in September when comparisons ease, in-stock levels improve in key products and programs to

> drive sales -- catalog, Sunscriptions, etc. --
> more fully materialize.

75. On September 12, 1996, only four weeks before the
end of the Class Period, Sunglass Hut continued its "growth as
panacea" scheme by telling investors that the Company expected to
add a total of 600 to 675 new stores in 1997. 400 of the new
stores would be Sunglass Huts, 50 to 75 would be EyeX stores and
150 to 200 would be Watch Station stores.

**The October 10, 1996 Announcement**

76. (a) The Class Period ends on October 10, 1996, the
date on which the Company first acknowledged that comparable store
sales were weak and that the Company expected future financial
results to be poor. In a press release issued that day, the
Company reported that sales for the five weeks ended October 5,
1996 were $40.0 million, and that comparable store sales increased
a meager 2.1% in relation to the same period in the prior year.
Commenting on these results, defendant Chadsey stated:

> The following factors are continuing to have a
> negative impact upon overall sunglass sales:
> a slowdown in mall traffic, which affects
> impulse sales; cooler weather globally as
> contrasted to much hotter weather during this
> same period in 1995; and a general lack of
> exciting new product in the market, which is
> impacting the destination shopper.
>
> Despite easier comparable store comparisons in
> the fourth quarter, we expect these general
> business trends to remain unchanged. Further-
> more, unless sales materially exceed our
> budget for the month of October, we would
> expect third quarter earnings per share to
> fall below 1995's $0.05 per share.

(b)   The market reaction to this devastating reversal was swift and sharp.  As a direct and immediate result of this surprising revelation concerning the weak sales and poor financial prospects of the Company, the trading price of Company stock fell from $13.50 per share, its closing price on October 9, 1996, to close at $9.19 per share on October 10, 1996, a one day decline of more than $4 per share or approximately 32% on unusually high volume of over 16 million shares.  The closing price on October 10, 1996, represented a decline in value of approximately 73% from the Class Period high of $33.125 per share (on March 29, 1996).  Upon further adverse revelations from the Company, the price of Sunglass Hut stock has continued to deteriorate.  Numerous analyst downgrades also followed the Company's October 10 news.

**Post-Class Period Events**

77.  On or about October 10, 1996, Alex. Brown reduced its rating of the Company to "Neutral" in a report that declared, among other things, "SEPTEMBER SAME-STORE SALES BELOW EXPECTA-TIONS"; "NEW STORE PERFORMANCE BELOW EXPECTATIONS"; "MASSIVE INVENTORY REDUCTION PROGRAM IN PLACE"; and "NEW STORE EXPANSION REDUCED SOMEWHAT."

78.  A critical report from Morgan Stanley that date explained further that:

> RAYS has a number of issues to contend with.
> First, store traffic and comps are likely to
> remain somewhat lackluster until 1Q97, when a
> number of manufacturers plan to launch new
> sunglass lines.  Second, it is experiencing an
> unanticipated slowdown in sales productivity.
> Third, inventory levels are now forecast to
> end 3Q96 at $170 million, up 78% from last
> year and $30 million above where we believe

they should be.  Fourth, interest expense
should be higher to reflect the carrying costs
of inventory.  Finally, the rate of new-store
growth could be hurt if RAYS discovers that
certain areas of expansion may not make eco-
nomic sense.  The outcome is a lack of good
sales and earnings visibility for 1997.

79.  Further, on October 10, 1996, the Bloomberg News
wire service reported in a story about Sunglass Hut's stunning
disclosures reported on the same day that Alan Millstein, editor of
Fashion Network Report said of Sunglass Hut:  "They're not selling
value, they're selling sizzle, and the sizzle is running out as far
as consumers are concerned.  The whole enterprise is filled with a
lot of helium with no end to the promises made to the investment
community.  To blame the weather is a limp excuse for overexpansion
and underdemand."  (Emphasis added.)

80.  Similarly, an October 11, 1996 report from Bear
Stearns summarized Sunglass Hut's deteriorating situation as
follows:

Sunglass Hut International:  Same-store sales
were Below Plan.  RAY's same store sales for
September were up 2.1% vs. up 9.6% last year.
Big disappointment in sales trends -- earnings
expectations dramatically reduced!  Double
digit same store sales declines were experi-
enced in new stores that have only recently
been included in the comparable base -- still
searching for reasons besides lack of traffic
and new products.  Inventory levels expected
to increase in the range of 60%-65% in Q3.  We
estimate Oct. same store sales to be flat to
up 2% vs. 4.2%LY.  (Emphasis added.)

81.  Thereafter, the Company reported additional facts
relating to the continuing decline of the Company's business, which
decline had set in prior to and continued during the Class Period.

(a)   On November 7, 1996, the Company reported that comparable store sales results for the four week period ending November 2, 1996 had declined 1.7% in relation to sales in the same period of the prior year.  Commenting on these disappointing results, and responding to the criticism of Sunglass Hut, defendant Chadsey stated, in pertinent part, that:

> As the sunglass industry continues to transi-
> tion, we have initiated actions which will
> give Sunglass Hut greater control over its
> business. ... we are evaluating the productiv-
> ity of our merchandise assortment, store
> location types and our vendors to ensure we
> can support our growth needs as well as meet
> the new product demands of our customers.
> That said, we are focused on getting back to
> the basics of our business ... .

(b)   On November 21, 1996, the Company reported its financial results for the third quarter of fiscal 1996, the quarterly period ended November 2, 1996.  For that period, the Company reported that per share results had decreased to a net loss of $0.05 per share or a loss of $2.9 million, compared to earnings of $0.05 per share or $2.5 million for the third quarter of fiscal 1995.  The Company reported significantly higher selling, general and administrative expenses (SG&A), primarily as a result of higher costs associated with the Company's expansion.  According to the Company:

> Third quarter results were negatively impacted
> by $0.03 per share due to charges to reflect
> higher than anticipated inventory shrinkage
> ... and changes in manufacturers' return
> policies which resulted in defective product
> write-offs.

The Company's press release also noted that sunglass sales had weakened and attributed the weakness to cooler weather and "a

general lack of exciting, new product ...".  Commenting on the
Company's disappointing results, defendant Chadsey stated:

> While we are navigating our way through this
> industry transition, we are repositioning the
> organization to attract new customers to our
> locations and to give greater control of
> future new product flow.  In addition, we are
> re-focusing the organization on the execution
> of the basics of our business ...  we expect
> general business trends to remain unchanged
> during the fourth quarter and we anticipate
> fourth quarter earnings per share to fall
> below 1995's levels.  Additionally, we are
> evaluating the profitability of our existing
> 2,000 stores in order to eliminate marginal or
> unprofitable sites through closure.  While
> this process is not yet complete, we expect
> that this evaluation will identify sites for
> closure.  We anticipate completing our review
> in the next 90 days and recording the cost
> associated with anticipated closures during
> the fourth quarter of fiscal 1996.

(c)  On December 5, 1996, the Company again
announced extremely disappointing comparable store sales results,
reporting that comparable store sales for the four-week period
ended November 30, 1996, had decreased 9.9%.  The Company also held
a conference call with investment analysts and other members of the
investment community, during which the Company commented on its
poor performance, explaining that the Company had taken a charge to
reflect approximately $1 million in shrinkage relating to its
Sunsations store locations, and also attributable to higher
inventory positions, as well as a $1.5 million charge reflecting a
negotiated settlement with a sunglass manufacturer, in which
Sunglass Hut and the manufacturer split the warranty costs
associated with defective glasses.

(d) Also on December 5, 1996, Oakley, one of the Company's largest vendors, announced that Sunglass Hut had previously "requested that Oakley delay shipment of its November orders" and that "Based on discussions with the Sunglass Hut and Oakley's own assessment of the Sunglass Hut inventory levels, the company [Oakley] believes Sunglass Hut will also delay or cancel all other orders pending this quarter."

(e) Similarly, on December 19, 1996, Bausch & Lomb, another of Sunglass Hut's key vendors, announced that Sunglass Hut had reduced orders in August and October, and that since that time, Sunglass Hut had cancelled all of its fourth quarter 1996 orders from Bausch & Lomb.

**Defendants Misrepresented**
**And Failed To Disclose**
**Material Facts**

82. In knowing or reckless disregard of the truth and/or as part of their ongoing scheme to foster the illusion of Sunglass Hut's continuing success, defendants continued to issue and/or participate in the issuance of materially false and misleading statements to the investing public as particularized above. These representations were materially false and misleading when made for the reasons set forth above and in that they falsely stated and/or failed to disclose the following material, adverse facts about Sunglass Hut's business operations and financial condition, which facts were known to or recklessly disregarded by defendants during the Class Period. Thus, defendants failed to disclose:

a. That the Company's ability to maintain continued sales growth was materially impaired;

b.    That the consolidation of the Company's warehouses and distribution facilities was flawed and impaired as a result of several problems, including numerous computer system-related problems and problems associated with inadequate and inadequately trained staff, and the use of manual tracking which hindered the ability of the Company to properly track and fulfill sales orders and which materially undermined the Company's selling efforts;

c.    That the Company's in-stock position and inventories were excessively bloated, resulting in excessive carrying costs, and the Company could not reasonably expect either to sell off or to return excess inventories to vendors with whom the Company enjoyed no such rights of return (notwithstanding defendants' remarks to the contrary);

d.    That operational difficulties at the Company precluded it from achieving distributional and sales efficiencies necessary for sustained growth;

e.    That Sunglass Hut falsely reported expanding markets for its product lines, thereby creating a materially false and misleading impression of increasing demand for the Company's products and thereby overstating its future sales growth and earnings prospects;

f.    That Sunglass Hut's Oakley product lines were not and would not be competing favorably in the market because (i) the Company was not providing adequate promotional support for the product line which was extremely sensitive to catalog and promo-tional efforts, and (ii) Oakley sunglasses are niche products which have limited markets and limited potential for providing sustained

revenue growth, especially when there was inadequate promotional and/or catalog support for these niche products;

g.    That the Company's "growth strategy" of rapidly opening new stores was a failure and that the Company would not only not be able to grow its way out of its problems but would have to retrench by closing 100 stores;

h.    That the premium sunglass market was saturated and the demand for its products had peaked;

i.    That a slowdown in mall traffic was having a substantial negative impact on the Company's sales as early as the beginning of the Class Period;

j.    That a lack of "exciting, new product" was severely impacting the Company's sales;

k.    That the Company's prescription eyewear and watch niche store concepts were inadequate to support Sunglass Hut's purported growth trajectory;

l.    That the Individual Defendants were aware of the adverse facts set forth above that Sunglass Hut was not experiencing successful expansion in its markets and that continued profitable growth was unlikely to occur;

m.    That defendants' guidance of Wall Street analysts to estimate the Company's earnings and its adoption of those estimates was misleading and unreasonable, when, in fact, those estimates were based on materially false and misleading information and projections provided by defendants, inasmuch as defendants did not have a good faith basis for believing that the estimates were true and were aware of (or recklessly disregarded) adverse facts that

seriously undermined the basis for the projections, including, inter alia, the inadequate promotional support provided to Sunglass Hut's products described above, the serious problems with the Company's distribution facilities, and negative sales trends which were severely short of planned levels. Defendants knew or recklessly disregarded that projections for the Company's future earning prospects could not and would not be met;

n.    That defendants' statements and projections as to future improved operations and profitability and earnings growth and momentum were lacking in reasonable basis and required correction during the Class Period;

o.    That defendants falsely stated and otherwise created the false impression that the Company's strategy of rapid expansion was successful, when, in fact, the Company was experiencing marketing and distribution problems which seriously undermined the ability of the Company to achieve earnings in keeping with what defendants had previously conditioned the market to expect, particularly in light of its inadequate advertising and promotional support and distribution problems associated with the Company's marketing efforts; and

p.    That defendants falsely stated and otherwise created the false impression that Sunglass Hut would sustain sales and earnings growth momentum, particularly in the second half of fiscal 1996, when, in fact, they knew or recklessly disregarded that such momentum was not likely to be sustained in light of the facts that the Company's prior sales trends were not indicative of future sales, especially given that the Company was experiencing and would

- 50 -

continue to experience marketing and distribution problems which further impaired the ability of the Company to achieve increased earnings.

## SCIENTER ALLEGATIONS

83. As alleged herein, defendants acted with scienter in that defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt or reckless disregard of information reflecting the true facts regarding Sunglass Hut, their control over, and/or receipt and/or modification of Sunglass Hut's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sunglass Hut, participated in the fraudulent scheme alleged herein. In particular, among other things:

(a) Defendants are each sophisticated individuals holding senior executive, managerial or other relationships and positions with the Company which provided to each of them the access and ability to receive and obtain information concerning the numerous material problems outlined above which adversely impacted the Company's operations at all relevant times.

(b)   As detailed below, the exceptional amount of "well-timed" insider sales of Company stock gives rise to a strong inference of scienter.

(c)   In addition, defendants had access to a purportedly state of the art distribution system which supposedly kept them apprised of precise trends, stock positions and sales. As the Company's 1995 Annual Report states at page 10:

> Our sophisticated point-of-sale computer
> system enables us to pinpoint sales trends
> both by location and by merchandise category.
> This allows us to keep ahead of the competi-
> tion by identifying what's hot, ensuring that
> stores have adequate stock on hand and working
> with vendors to develop new products.

(d)   Moreover, the Company enjoyed substantial relationships with key vendors, characterized by the Company as "partnerships" (Annual Report at 8), which placed defendants in a unique position to know and remain abreast of prevailing product and selling trends and market conditions, and resulted in a sharing of forecasting assumptions and other vital market information which indicated that the Company's markets had substantially weakened.

84.   A key management tool for Sunglass Hut's Board and top executives was Sunglass Hut's business plan, budget, forecast and/or yearly projection, by which Sunglass Hut's top executives set performance goals for Sunglass Hut and its various divisions and then closely monitored the Company's actual performance, i.e., results of operations, compared to the planned, budgeted and/or forecasted results on a continuing basis. These plans, forecasts and budgets were prepared at least annually, and were updated during the year. All of the Individual Defendants were aware of

Sunglass Hut's internal plan, forecast and budget and of the internal reports prepared and circulated monthly and quarterly comparing Sunglass Hut's actual results to those previously planned, budgeted and/or forecasted. Sunglass Hut's senior executives used Sunglass Hut's internal plan, budget and forecast as the basis for the statements they made publicly about Sunglass Hut's performance during the Class Period. Based on the negative internal reports of Sunglass Hut's actual business performance compared to that planned, budgeted and forecasted, defendants knew or recklessly disregarded at all relevant times that those public statements, and those of securities analysts for which Sunglass Hut is responsible, were false and misleading when made and were inflating the market price of Sunglass Hut common stock.

85. Throughout the Class Period, by virtue of their status as senior executives and directors of Sunglass Hut, the Individual Defendants, and certain other key management personnel of the Company, held periodic meetings to discuss material aspects of the Company's continuing operations. At or prior to such meetings, defendants were able to and did receive the Company's internal plans, projections, budgets and forecasts as well as information and data conveying the Company's actual performance, i.e., results of operations, compared to the planned, budgeted and/or forecasted results on a continuing basis. Based on the negative internal reports of Sunglass Hut's actual business performance compared to that planned, budgeted and forecasted, defendants knew or recklessly disregarded that the Company's public statements, and those of securities analysts for which Sunglass Hut

assumed responsibility by its actions, were false, misleading and lacking in reasonable basis when made and were inflating the market price of Sunglass Hut stock, at all relevant times.

86.   The Company engaged in such scheme to facilitate its own sale of approximately $100 million of convertible debentures, on or about June 20, 1996, during the Class Period, in order to raise needed capital.

87.   The Individual Defendants engaged in such a scheme to inflate the price of Sunglass Hut securities in order to facilitate substantial and extremely profitable insider sales of Sunglass Hut stock during the Class Period, as set forth below:

**CHADSEY, JACK B.**

| DATE | SHARES | PRICE | PROCEEDS |
|------|--------|-------|----------|
| 4/25/96 | 50,000 | 32.70 | $ 1,635,000 |
| 4/30/96 | 50,000 | 32.00 | $ 1,600,000 |
|  |  | **TOTAL** | **$ 3,235,000** |

**GRUND, EDWARD L.**

| DATE | SHARES | PRICE | PROCEEDS |
|------|--------|-------|----------|
| 4/16/96 | 8,250 | 27.94 | $    230,505 |
| 4/16/96 | 8,000 | 27.94 | $    223,520 |
| 4/16/96 | 5,000 | 28.19 | $    140,950 |
| 4/16/96 | 15,000 | 27.94 | $    419,100 |
|  |  | **TOTAL** | **$ 1,014,075** |

**PETERSEN, LARRY G.**

| DATE | SHARES | PRICE | PROCEEDS |
|------|--------|-------|----------|
| 4/18/96 | 7,000 | 28.00 | $ 196,000 |
| 4/18/96 | 2,500 | 27.75 | $ 69,375 |
| 4/18/96 | 10,000 | 27.75 | $ 277,500 |
| 4/18/96 | 15,000 | 27.88 | $ 418,200 |
| | | TOTAL | $ 961,075 |

**PITA, GEORGE L.**

| DATE | SHARES | PRICE | PROCEEDS |
|------|--------|-------|----------|
| 4/19/96 | 10,000 | 28.25 | $ 282,500 |
| 4/19/96 | 2,500 | 28.69 | $ 71,725 |
| 4/19/96 | 500 | 28.69 | $ 14,345 |
| 4/19/96 | 14,500 | 28.19 | $ 408,755 |
| | | TOTAL | $ 777,325 |

**Total for Individual Defendants:  $5,987,475**

88.   The market for Sunglass Hut's common stock was open, well-developed and efficient at all relevant times.  As a result of the above-described false and misleading statements and failures to disclose the full truth about Sunglass Hut and its business and future prospects, the Company's common stock traded at artificially inflated prices during the entire Class Period until the time the adverse information described above was finally provided to and digested by the securities market.  Plaintiffs and other members of the Class purchased or otherwise acquired Sunglass Hut common stock relying upon the integrity of the market price of Sunglass Hut stock and market information related to the Company, or in the alternative, upon defendants' false and misleading statements, and

- 55 -

in ignorance of the adverse, undisclosed information known to Defendants, and have been damaged thereby. Upon disclosure of the true facts regarding the Company, the market valuation of the Company's stock declined precipitously. Had plaintiffs and other members of the Class known of the materially adverse information not disclosed by Defendants, they would not have purchased or acquired Sunglass Hut's common stock at the artificially inflated prices that they did.

89. At all relevant times, the misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of false statements about Sunglass Hut's revenues and earnings. These misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Sunglass Hut, its profitability and its future business prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' false portrayal of Sunglass Hut, its business, operations and future prospects during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's common shares at a disparity between their market price and their actual value, thus causing the damage complained of herein.

## COUNT I

### [Against All Defendants For Violations Of Section 10(b) Of The Exchange Act]

90.   Plaintiffs repeat and reallege each and every allegation set forth above.

91.   This claim is brought against the defendants with respect to the entire Class Period and on behalf of the Class.

92.   The defendants individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and prospects of Sunglass Hut as specified herein.   The defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sunglass Hut's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Sunglass Hut and its business operations and prospects in the light of the circumstances under which they were made, not misleading, at least to the extent set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers of Sunglass Hut securities during the Class Period.

93.  The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Sunglass Hut's operating condition and business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by defendants' misstatements of the Company's business, operations and financial condition throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

94.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Sunglass Hut securities were artificially inflated during the Class Period.  In ignorance of the materially false and misleading nature of the reports and statements described above, plaintiffs and other members of the Class relied, to their damage, on the reports and statements described above and/or on the integrity of the market prices of Sunglass Hut securities and the completeness and accuracy of the information disseminated to Sunglass Hut investors in connection with their purchases of the Company's securities.

95.   At the times of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.   Plaintiffs and other class members could not in the exercise of reasonable diligence have known the actual facts.   In reliance on said misrepresentations and in reliance upon the superior knowledge and expertise of defendants and on the integrity of the market, plaintiffs and other members of the Class were induced to and did purchase Sunglass Hut securities at artificially inflated prices. Had plaintiffs and other members of the Class known the truth, they would not have taken such action.

96.   By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder of the Exchange Act.

97.   Plaintiffs and other members of the Class have been damaged by defendants' violations as described in this Count and seek recovery for the damages caused thereby.

## COUNT II

### [Against The Individual Defendants For Violations Of Section 20(a) Of The Exchange Act]

98.   Plaintiffs repeat and reallege each and every allegation made above.

99.   This Count is brought by plaintiffs against the Individual Defendants with respect to the entire Class Period and on behalf of the Class.

100. By reason of their control over the operations of Sunglass Hut, the Individual Defendants are "controlling persons"

of the Company within the meaning of § 20(a) of the Exchange Act and had the power and influence (which they exercised) to cause Sunglass Hut to engage in the unlawful conduct complained of herein, and could have prevented such violations from taking place but failed to do so.

101. By reason of these Individual Defendants each being a "controlling person," as that term is defined in Section 20(a) of the Exchange Act, of other persons primarily liable to plaintiffs and the Class pursuant to the claims arising under Section 10(b) of the Exchange Act alleged above, the defendants named in this Count are secondarily liable for those primary violations pursuant to Section 20(a) of the Exchange Act.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A.  Declaring this action to be a plaintiff class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.  Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.  Awarding plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.   Awarding plaintiffs and other members of the Class such

other and further relief as may be just and proper under

the circumstances.

Dated:   January 23, 1997

**BURT & PUCILLO**

By: _____

Michael J. Pucillo
Florida Bar No. 261033
Wendy H. Zoberman
Florida Bar No. 434670
222 Lakeview Avenue
Suite 300 East
West Palm Beach, FL 33401
(561) 835-9400

Steven G. Schulman
Richard H. Weiss
Ralph M. Stone
**MILBERG WEISS BERSHAD
 HYNES & LERACH LLP**
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300

Jules Brody
Mark Levine
Melissa R. Emert
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017

Jack G. Fruchter
**FRUCHTER & TWERSKY**
275 Madison Avenue
Suite 1000
New York, NY 10016
(212) 889-9351

Richard S. Schiffrin
Andrew L. Barroway
**SCHIFFRIN & CRAIG, LTD.**
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706

Joseph Weiss
Jack Zwick
**WEISS & YOURMAN**
551 Fifth Avenue
New York, New York   10176
(212) 532-4171

- and -

Robert C. Susser
**R O B E R T   C .   S U S S E R ,   P . C .**
6 East 43rd Street
Suite 1900
New York, NY   10017-4609
(212) 808-0298

Attorneys for Plaintiffs

99999\sunglass.cpt

CERTIFICATION OF ALBERT BIAGAS
IN SUPPORT OF CLASS ACTION COMPLAINT

Albert Biagas ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions relating to Sunglass Hut International, Inc. securities: See Attachment A

5.    In the past three years, plaintiff has not sought to serve, nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1st

day of January, 1997.

ALBERT BIAGAS

## ATTACHMENT A

## ALBERT BIAGAS

| Date | Action | Amount |
|------|--------|--------|
| 09/13/96 | Buy | 300 shares |
| 10/10/96 | Buy | 1,000 shares |
| 10/11/96 | Sold | 1,300 shares |

## DECLARATION OF A. GARFINKEL
### TO SERVE AS CLASS REPRESENTATIVE

1. I make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 and as required by Section 21D(a)(2) of Title I of the Securities Exchange Act of 1934.

2. I have reviewed the attached securities class action complaint (the "Complaint") filed on my behalf and on behalf of all others similarly situated and authorize its filing.

3. I did not purchase the security that is the subject of the Complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Act of 1934.

4. I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary.

5. To the best of my current knowledge, the following are all of my transactions in the security that is the subject of the Complaint during the class period specified in the Complaint:

### Purchases

| Date of Purchase | No. of Shares | Description & No. of Options |
|---|---|---|
| March 21, 1996 | 1,000 | |
| April 1, 1996 | | May 35 Calls: 10 |
| June 14, 1996 | | July 25 Calls: 10 |
| July 1, 1996 | 2,000 | |
| July 2, 1996 | 1,000 | |
| August 19, 1996 | 2,000 | |
| May 20, 1996 | 1,000 | |
| September 25, 1996 | 1,000 | |
| October 8, 1996 | 1,000 | |

| Date of Sale | No. of Shares | Description & No. of Options |
|---|---|---|
| March 25-26, 1996 | 1,000 | |
| March 29, 1996 | | May 35 Calls: 10 |
| April 2, 1996 | | May 30 Puts: 10 |
| July 2, 1996 | | Aug. 20 Puts: 10 |
| July 3, 1996 | | Aug. 17.5 Puts:10 |
| September 26, 1996 | 1,000 | |
| December 31, 1996 | 1,000 | |

6.   During the three year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under Title I of the Securities Exchange Act of 1934.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class, as set forth in the Complaint, beyond my pro rata share of any recovery, except as ordered or approved by the Court.

8.   I make this declaration without waiver of any applicable privileges and without waiver of any right to challenge the necessity for, or the constitutionality of, this declaration or to object to the filing of this declaration on any ground whatsoever.

9.   The matters stated in this declaration are true to the best of my current knowledge, information and belief.

Executed under penalty of perjury under the laws of the United States of America.

Date:  January 22, 1997

_A. Garfinkel_
A. GARFINKEL

TOTAL P.03

TOTAL P.03

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Stephen Colanero ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff purchased Sunglass Hut International common stock as follows:

Security              Transaction              Date

Common Stock        Purchased 1,000 shares    July 18, 1996

5.    During the three years prior to the date of this Certificate, Plaintiff has sought to serve or served as a representative party for a class in the following actions:

NONE

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true
and correct.  Executed this __9__ day of __JAN__, 199_7_, in _Phila_
_____, Pennsylvania.

_____
STEPHEN COLANERO

SUNGLASS/COLANERO.CRT

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Gina Florens, duly swears and says as follows:

1.    I have reviewed the Complaint and authorize its filing.

2.    I did not purchase the security that is the subject of this action at the direction of my counsel, or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this action during the Class Period are as follows:

| Securities | Transactions | Date | Price |
|---|---|---|---|
| Sunglass Hut | Shares Purchased | | |
| | 500 | 5/21/96 | $28 |
| | 500 | 7/2/96 | $18 |

5.    I have not sought to serve as a class representative in any case in the last three (3) years.

6.    I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representative of the class.

I declare under penalty of perjury that the foregoing is true

and correct. Executed this 17th day of January, 1997, at Coral Springs, Florida.

Gina Florens

-2-